## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KERRY A. LIST,** | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:03-1788 |
| v. | : | (CAPUTO, D.J.) |
| | : | (MANNION, M.J.) |
| **JO ANNE B. BARNHART, Commissioner of Social Security,** | : | |
| | : | |
| Defendant | : | |

## **REPORT AND RECOMMENDATION**

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("SSI"), under Title XVI of the Social Security Act, ("Act").  42 U.S.C. §§ 1381-1383f.

Based upon a review of the record, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

**I. Procedural Background**

The plaintiff filed her application for SSI benefits on July 26, 1999, in which she alleged disability since January 1, 1999 due to residuals from viral

encephalitis[1] and residuals from a leg fracture. (TR. 17).

After her claim was denied initially and upon reconsideration (TR. 81-91), the plaintiff's application eventually came on for a hearing before an administrative law judge, ("ALJ") on January 7, 2003. (TR. 27-70). The plaintiff was represented at her hearing before the ALJ by the same counsel who is representing her in this appeal. In addition to the testimony of the plaintiff, the ALJ heard testimony from witnesses Martin and Evelyn Geller, as well as vocational expert (VE) Marlin Kester.

On February 21, 2003, the ALJ issued a decision in which he found that the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; the plaintiff had an impairment or a combination of impairments considered "severe" based on the requirements in 20 C.F.R. § 416.920(b); those medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4; the ALJ found that the plaintiff's allegations regarding her limitations were not totally credible for the reasons set forth in the body of the decision; the ALJ had carefully considered all of the medical opinions in the record regarding the severity of the plaintiff's impairments (20 C.F.R. § 416.927); the plaintiff had the residual functional capacity to perform unskilled work at the sedentary exertional level. She could occasionally lift/carry 10

---

[1]Encephalitis is defined as inflammation of the brain. STEDMAN'S MEDICAL DICTIONARY 586 (27TH ed. 2000).

pounds. She could stand/walk for 4 hours in an 8 hour work day with frequent rests. She needed a hand held assistance device for balance/ambulation. She had no limitation on sitting. She could never balance or climb and she could occasionally bend, kneel, stoop and crouch; the plaintiff had no past relevant work (20 C.F.R. § 416.965); the plaintiff was a "younger individual" between the ages of 18 and 44 (20 C.F.R. § 416.963); the plaintiff had a "high school (or high school equivalent) education" (20 C.F.R. § 416.964); the plaintiff had the residual functional capacity to perform a significant range of sedentary work (20 C.F.R. § 416.967); Although the plaintiff's limitations did not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.27 as a framework for decision-making, there were a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a telephone quote clerk, 350 locally and 4,700 nationally; a surveillance system monitor, 500 locally and 277,000 nationally and an order clerk (food), 800 locally and 95,500 nationally; and, the plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the ALJ's decision (20 C.F.R. § 416.920(f)). (TR. 24-25).

Plaintiff filed a request for review of the ALJ's decision. (TR. 11). On September 23, 2003, the Appeals Council concluded that there was no basis upon which to grant her request for review. (TR. 6-8). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Currently pending before the Court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on October 7, 2003. (Doc. No. 1).

## II. Disability Determination Process

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 CFR § 416.920 (2000).

The instant action was ultimately decided at the fifth step of the process when the ALJ determined that considering the plaintiff's age, educational background, work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy.  (TR. 23).

## III.  Evidence of Record

The plaintiff was born on December 16, 1958  and was forty-four (44) years old at the time of the ALJ's decision.  (TR. 17, 32, 108).  She has no

past relevant work experience. The plaintiff has a high school equivalent education. (TR. 17).

The medical evidence of record establishes that in April, 1998, the plaintiff was treated at St. Mary's Hospital in West Palm Beach Florida for a right ankle sprain suffered as a result of jumping off of a three foot wall. (TR. 156). At that time, Dr. Henry Kurusz, M.D., plaintiff's treating physician at St. Mary's, noted that the plaintiff reported a history of viral encephalitis and a past left foot fracture. (TR. 156). X-rays of the plaintiff's right ankle were negative for any bone abnormalities. (TR. 157).

In May, 1999 Dr. David L. Cohen, M.D. examined the plaintiff after she slipped in her yard. (TR. 161). Testing performed at York Hospital demonstrated a fractured distal left tibia-fibula. (TR. 161). At that time the plaintiff was placed in a posterior splint and instructed to follow up in the Orthopedic Clinic. (TR. 161). The plaintiff underwent an open reduction and internal fixation on May 6,1999. (TR. 161). She was discharged on May 7,1999 with instructions to keep her left leg elevated for 1-2 weeks and maintain non-weight bearing on the left lower extremity. (TR. 161).

In an examination on May 25, 1999, Dr. Todd Tredinnick, M.D. stated that the plaintiff's post-operative splint was removed, that her incisions were clean and without evidence of infections, her staples were removed and a short leg cast had been applied. (TR. 199). He further noted that the x-rays demonstrated good position of the hardware from the open reduction. (TR.

199).

A series of x-rays were taken to track the plaintiff's healing. The first, taken shortly after the injury occurred, showed no significant displacement or angulation at the fracture site. (TR. 179). The images from May 4, 1999 indicated mild medial and proximal displacement and lateral angulation of the distal segment. (TR. 170). The test also identified difuse osteoporosis in the ankle. (TR. 171). The x-rays from May 18,1999 showed that the fracture fragments in the left ankle appeared held in good position and that the ankle mortise continued to be intact and in good position. (TR. 170). The May 25, 1999 tests noted that the position and alignment remained unchanged from May 18, when the last x-rays were obtained and that the position and alignment remained anatomic while the metallic plates and screws were still intact. (TR. 169). Later images taken on July 20, 1999 showed satisfactory alignment and apposition of the fracture fragments, but indicated that the bones were osteoporotic[2]. (TR. 167).

On September 17, 1999 Dr. Eric Binder examined the plaintiff when she applied to the Pennsylvania Bureau of Disability Determination. (TR. 180). Dr. Binder's examination revealed no clubbing or cyanosis of the lower extremities, but some edema and atrophy in the left leg with the left calf smaller than the right. (TR. 181). Dr. Binder completed a medical source

---

[2] Osteoporotic is defined as pertaining to, characterized by, or causing a porous condition of the bones and joints. STEDMAN'S MEDICAL DICTIONARY 1286 (27TH ed. 2000).

6

statement indicating that the plaintiff had the ability to lift and/or carry no more than 10 pounds, stand and/or walk 2-6 hours during an 8 hour workday (4 hours with frequent rest) using a hand held device for balance and ambulation and perform unlimited sitting.  (TR. 182-185). In addition, he reported that the plaintiff was unable to balance or climb, but could occasionally bend, kneel, stoop, and crouch.  (TR. 182-185).  An additional treatment note from York Health Orthopedic Clinic dated October, 1999 reported that the plaintiff was doing well.  (TR. 195).  The record indicates that the plaintiff was not seen after that date.

Michael Sams, D.O., consultative examiner, performed an evaluation in February, 2000 reporting that all pulses were present and equal in the lower extremities with no edema noted.  (TR. 203).  He noted loss of muscle in the left calf with the leg approximately ¼ to ½ inch shorter than the right leg due to the fracture and resultant surgery.  (TR. 203).  Dr. Sams reported that the plaintiff had an unbalanced gait due to the shortened left leg, which could be corrected by placing a lift in her left shoe.  (TR. 203).  Sensation was intact at that time.  (TR. 203).  Motor strength in the right and left upper and the right lower extremities were normal.  (TR. 203).  The left lower extremity was +2 to +3.  (TR. 203).  He reported that she had a fair prognosis with the ability to lift 10 pounds, stand and/or walk up to one hour and perform unlimited sitting. In addition, the plaintiff was unable to kneel, stoop, crouch, balance or climb, but could occasionally bend.  (TR.  205-208).

Dr. Sams also examined the plaintiff's eyes. (TR. 209). The visual acuity test that Dr. Sams administered showed that the plaintiff's eyes were 20/40 with correction and 20/50 without correction. (TR. 209).

The plaintiff underwent a mental status consultative evaluation in September, 1999 by Anthony Fischetto, Ed.D. (TR. 186-190). The plaintiff reported to Dr. Fischetto that she tended to be aggressive, to tell people off, and was irritable. (TR. 186). She reported being in a psychiatric hospital one time in 1992 or 1993 because of her aggression. (TR. 186). The plaintiff further reported three failed marriages, but noted that she had never received any counseling, therapy, treatment or medication. (TR. 186).

Upon examination, Dr. Fischetto reported that although the plaintiff's psychomotor activity was somewhat slow, her insight was limited, she cried a little during the evaluation, she was pleasant and cooperative. (TR. 187). He noted that her memory and immediate retention and recall were intact, her reliability was good, that she exhibited good eye contact and had a happy mood. (TR. 187).

Dr. Fischetto determined that she had borderline personality disorder features. (TR. 187). He based this determination on his findings that the plaintiff had a fear of being abandoned, had a pattern of unstable relationships characterized by abuse, was unsure about her own self identity, had feelings of emptiness, had difficulty controlling her anger and was paranoid. (TR. 187).

Dr. Fischetto administered the Wechsler Adult Intelligence Scale III Edition exam to the plaintiff. (TR. 187). The exam showed that the plaintiff had low average abstract thinking, low average concentration and a full IQ scale of 76. (TR. 188). In regard to activities of daily living, while the plaintiff did not drive and had difficulty shopping, she was able to care for her own personal needs and perform household chores. (TR. 188).

Socially, Dr. Fischetto determined that while the plaintiff had a low average social maturity, she got along well with others, participated in group activities and had no problems with authority. (TR.188). In regard to concentration and task persistence, he reported that the plaintiff was able to carry out simple instructions, perform activities within a schedule and complete tasks from beginning to end. (TR. 188). While she was unable to adapt to changes well, she was able to react to deadlines and schedules. (TR.189). As a result of this examination, Dr. Fischetto gave the plaintiff a fair prognosis, believing that she could benefit from therapy to cope with her emotional problems. (TR. 188).

**IV. Discussion**

The plaintiff raises two issues on appeal. First, she states that the ALJ erred by not considering the severity of the combination of her impairments. Next, the plaintiff argues that the ALJ erred in finding the plaintiff's allegations regarding her limitations to be less than fully credible.

A. <u>WHETHER THE ALJ ERRED BY NOT CONSIDERING THE PLAINTIFF'S IMPAIRMENTS IN COMBINATION.</u>

The plaintiff asserts that the ALJ erred by not considering the severity of the combination of her impairments. (Doc. No. 8, p.3). The plaintiff concedes that the ALJ considered Listings 1.00, 12.05 and 12.08, but argues that he did not consider her severe and non-severe impairments in combination. (Doc. No. 8, p.3).

Social Security Ruling 85-28 mandates that "[a]lthough an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered," Thus, even when an impairment is not severe, according to SSR 85-28, "when assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment existing alone."

> In determining whether your physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. 404.1523.

The plaintiff contends that, in combination, her visual and mental impairments, residuals from a leg fracture and residuals from viral encephalitis meet or equal a listed impairment. (Doc. No. 8, p.3). The ALJ considered each alleged impairment alone and in combination. He found that the severity of visual impairments alleged by the plaintiff was not supported by the record; the residuals from the fracture were not considered "severe" under the Regulations; and that there was nothing in the record indicating residual effects of encephalitis.

In her brief, the plaintiff suggests that the ALJ failed to consider all of her impairments in combination with her vision problems. (Doc. No. 8, p.3). In reviewing the decision of the ALJ, it is clear that he considered the plaintiff's allegations of visual impairment. However, upon reviewing the medical findings, the ALJ determined that such allegations were not supported by the record. In his decision, the ALJ referred to the plaintiff's testimony that she had not renewed her driver's license because of her poor eyesight. (TR. 42). He also pointed to the plaintiff's statement that she could only see things that were within a foot and that things farther away were blurry. In his review of the record, the ALJ found that none of the examining physicians corroborated plaintiff's testimony regarding the extent of her visual limitations. Accordingly, the ALJ properly concluded that the plaintiff did not have a "severe" vision impairment as defined in the Regulations. (TR. 18).

The record reflects that the ALJ considered the combination of the plaintiff's impairments when eliciting the testimony of the VE through the use of hypothetical questions. (TR. 64-66). The Third Circuit has held, with respect to hypothetical questions posed to vocational experts, that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). A hypothetical question posed to a vocational expert "must reflect all of a claimant's impairments." *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987). In *Burns v. Barnhart*, the Third Circuit state that "[w]here there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." 312 F.3d 113, 123 (3d Cir. 2002). When an ALJ's hypothetical question to the vocational expert sets forth the plaintiff's limitations as supported by the record, the vocational expert's testimony may be accepted as substantial evidence in support of the ALJ's determination that the plaintiff is not disabled. *Chrupcala*. 829 F.2d at 1276.

Here, the ALJ presented hypothetical questions to the VE that reflected all of the plaintiff's impairments and limitations that were supported by the

record.  (TR.64-66).   Also, despite the fact that the severity of the plaintiff's visual impairments was not supported by the record, the ALJ included such limitations when posing the hypothetical questions to the VE.  (TR. 67).

Based on the record, the ALJ determined that the plaintiff maintained the residual functional capacity[3] to perform unskilled work at the sedentary exertional level[4].  (TR. 22).   Accordingly, he found that the plaintiff could lift/carry 10 pounds; that she could stand/walk for 4 hours in an 8 hour work day with frequent rests; that she needed a hand held device for balance/ambulation; and had no limitations on sitting. (TR. 22). He found that she can never balance or climb but could occasionally bend, kneel, stoop and crouch.  (TR. 22).

When posing the questions to the VE, the ALJ described a hypothetical person who matched the plaintiff in age, education and residual functional capacity, as supported by the record.  (TR. 64-69).  The ALJ then asked the

---

[3] The term "residual functional capacity" is defined in the Regulations as the most that an individual can still do after considering the effects of physical and/ or mental limitations that affect the ability to perform work-related tasks. 20 C.F.R. §416.945 and Social Security Ruling 96-8p.

[4] Sedentary work is defined as follows: (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

VE if there were any jobs in the national economy that the hypothetical person could perform. (TR. 64-69). The VE testified that there were jobs available and provided examples of such jobs. (TR. 64-69). The examples provided were: telephone quote clerk, surveillance system monitor and order clerk (food). (TR. 65). The VE also provided the Dictionary of Occupational Titles ("DOT") codes, the number of jobs available regionally and nationally, and stated that his testimony was consistent with the DOT. (TR. 65).

It is clear that the ALJ presented all of the limitations supported by the record when posing the hypothetical questions to the VE. The VE testified that, after considering the effect of the combination of impairments, jobs existed in the national economy that the plaintiff could perform. Accordingly, substantial evidence existed for the ALJ to determine that the plaintiff's impairments, alone or in combination, do not meet or equal a listed impairment.

    B.    <u>WHETHER THE ALJ ERRED IN FINDING THE PLAINTIFF'S ALLEGATIONS REGARDING HER LIMITATIONS TO BE LESS THAN FULLY CREDIBLE.</u>

The plaintiff contends that in not finding her testimony entirely credible, the ALJ failed to follow SSR 96-7p, which addresses the procedure by which the Commissioner must evaluate symptoms in disability claims and assess the credibility of an individuals statement.

The plaintiff also asserts that it was erroneous for the ALJ to base his

14

determination on her daily activities when testimony of her limitations was corroborated by the testimony of two other witnesses.

The Social Security Regulations provide a framework under which a plaintiff's subjective complaints are to be considered. 20 C.F.R. §404.1529. First, symptoms, such as pain, shortness of breath, fatigue, *et cetera,* will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §40431529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. §404.1529(b). In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. §404.1529(b). Social Security Ruling 96-7 gives the following instruction in evaluating the credibility of the claimant's statements regarding her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *see also Cassias v. Secretary of Health & Human Services.,* 933 F.2d 799, 801 (10th Cir. 1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility,')." *Frazier v. Apfel,* 2000 WL 288246 (E.D.Pa. March 7, 2000).

Here, the ALJ conceded that the medical evidence established that the plaintiff had residuals of a left tibia-fibula fracture, borderline I.Q. functioning and personality disorder, medically determinable impairments that could reasonably be expected to produce some of the plaintiff's symptoms. (TR. 21). However, he found that the plaintiff was not entirely credible concerning the intensity, duration, and limiting effects of the symptoms. (TR. 21).

The plaintiff alleged severe problems with leg/foot pain, poor eyesight and dizziness. (TR. 41,45,48,49). However, she testified to only taking over the counter medication to relieve the symptoms. (TR. 34,44). She had applied for jobs, which indicated to the ALJ that she believed that she was capable of working. (TR. 39). Further, the plaintiff testified that she performed household chores including cooking and cleaning and that she was able to care for her own personal needs. (TR. 33, 35,36,37,39)

The plaintiff testified that she must elevate her left leg periodically, but

16

medical records revealed that she was only instructed to do so for 1-2 weeks following her surgery. (TR. 40,44,45,46). Furthermore, despite the constant pain that the plaintiff alleges, the record indicates that she has not seen an orthopedist since 1999.

It should be noted, as the ALJ explained at the hearing, that this case was remanded to the ALJ, from the Appeals Council on an appeal of his May 2001 decision[5]. (TR. 29). At that time, the ALJ determined that the plaintiff's medically determinable impairments, while severe, were not sufficiently severe to meet the definition of disability. (TR. 29). According to the ALJ, at the first hearing, the plaintiff alleged that she would be able to do sedentary jobs like inspecting. (TR. 22). However, she was skeptical of such work at the second hearing, although there was no evidence of any deterioration in her condition between the first and second hearing. (TR. 39-40).

Dr. Binder, Dr. Patterson and Dr. Sams, the State Agency medical consultant, all examined the plaintiff and found that her limitations were consistent with sedentary work. (TR. 180,200-204,223-230). Dr. John Gavazzi, Psy.D, determined that she could perform simple routine tasks. (TR. 210-222). Similarly, the psychologist who evaluated the plaintiff noted that she had good memory, was able to carry out simple instructions, perform

---

[5] The Appeals Council was unable to locate the tape from the first hearing to reach a decision and therefore, the case was sent back to the ALJ to "do over." (TR. 29).

activities within a scheduled time and react to deadlines. (TR. 186-190).

The ALJ pointed out that, although the physician who examined the plaintiff in September, 1998 indicated that he suspected glaucoma, there was no indication that the plaintiff was receiving any treatment for a visual impairment. (TR. 158). Additionally, the visual acuity test administered in February, 2000 revealed visual acuity of 20/50 without correction and 20/40 with correction. (TR. 209).

Further, Dr. Binder and Dr. Sams indicated that the plaintiff had no restrictions relating to a visual impairment. (TR. 183, 206, 226). Dr. Fischetto indicated in his report that the plaintiff has poor eyesight. (TR. 189). However, Dr. Fischetto conducted a psychological examination of the plaintiff, not physical. His statement concerning the plaintiff's eyesight is apparently based on her subjective complaints and not on medical findings.

Similarly, the ALJ discussed the plaintiff's assertion that she had not been able to "think right" since she was infected with viral encephalitis at age seven. She alleged that she developed inflammation of the brain after being bit by a mosquito, and that the inflammation affected her balance her entire life. (TR. 22). After reviewing the record, the ALJ determined that there was no medical evidence of any diagnosis or treatment relative to this alleged condition. (TR. 18). In his report, Dr. Sams stated that, although he was aware that the plaintiff had a history of viral encephalitis, he was "unclear as to what role this plays in her present situation." (TR. 204). Noting at that time

that "the patient had this as a child, some 30 years ago." (TR. 204). The ALJ noted that the plaintiff's subjective complaints of symptoms, in the absence of medical evidence, cannot be used to substantiate the presence of a medically determinable impairment.

Accordingly, for the reasons set forth above, the ALJ properly found that the claimant was not fully credible regarding her limitations and their effect on her ability to perform substantial gainful activity.

**V. Conclusion**

Based upon the evidence of record, it is recommended that the plaintiff's appeal of the decision of the Commissioner of Social Security (Doc. No. 1) be **DENIED.**

<u>**s/ Malachy E. Mannion**</u>

**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated: November 15, 2004**
O:\shared\REPORTS\2003 Reports\03-1788.wpd